The judgment is affirmed pursuant to Rule 30.25(b).

STATE of Missouri, Plaintiff/Respondent,

v.

Travis Lee TITTLE, Defendant/Appellant.

No. 71484.

Missouri Court of Appeals,
Eastern District,
Division One.

Nov. 11, 1997.

Henry B. Robertson, St. Louis, for defendant/appellant.

Robert G. Wilkins, Pros. Atty., Michael D. Lowry, Asst. Pros. Atty., Jefferson County, Hillsboro, for plaintiff/respondent.

Before GRIMM, P.J., and PUDLOWSKI and GARY M. GAERTNER, JJ.

*ORDER*

PER CURIAM.

A jury convicted defendant of driving while intoxicated and third degree assault of a law enforcement officer. The trial court imposed a sentence of 30 days in the county jail and fined defendant a total of $1200.

Defendant raises two points on appeal, neither of which concerns preserved error. We have reviewed the record and find no error resulting in manifest injustice. Rule 30.20.

No jurisprudential purpose would be served by a written opinion. However, the parties have been furnished with a memorandum opinion for their information only, setting forth the facts and reasons for this order.

Dong LI, et al., Plaintiffs/Appellants,

v.

METROPOLITAN LIFE INSURANCE COMPANY, INC., Defendant/Respondent.

No. 71868.

Missouri Court of Appeals,
Eastern District,
Division Two.

Nov. 11, 1997.

Alan G. Kimbrell, St. Louis, for plaintiffs/appellants.

Ann E. Buckley, St. Louis, for defendant/respondent.

RHODES RUSSELL, Judge.

Appellants appeal from summary judgment entered in favor of defendant Metropolitan Life Insurance Company ("MetLife") on their libel claim. The issue is whether alleged defamatory statements, contained in an insurance agent's letter transmitted to the Department of Insurance ("Department"), were relevant to the Department's inquiry into claims of misrepresentation. We find that the statements were relevant, and therefore, were absolutely privileged. We affirm.

The facts in this case are fairly detailed, but are generally uncontested by the parties. During 1991 and 1992, appellants each purchased a life insurance policy (an "L95 policy") from MetLife through its agent, Bruno Wu. During the spring of 1993, some of the appellants complained to MetLife about their insurance purchases from Wu. Appellants sent a letter to MetLife's CEO asserting that Wu had not followed the appropriate sale procedures established by MetLife, and that he had misrepresented some of the important aspects of the L–95 policy. In particular, appellants complained that Wu committed the following misrepresentations: 1) appellants were misled into buying the policies because they were sold as the "best investment" for their money; 2) appellants were told that a "7 or 8–year premium paying period" was guaranteed, and that they could cash their dividends after a couple of years without affecting the total net payment; 3) no financial need analysis was performed and, therefore, more insurance was sold than needed; and, 4) no information was provided to appellants so that they could make an informed decision as to what kind of policy best fitted their insurance needs. The letter requested cancellation of the policies and return of their premiums.

After receiving these complaints, MetLife's Consumer Relations Department contacted its branch manager, and asked that he obtain and provide a statement from Wu with respect to the complaints made. MetLife's Consumer Relations Department received a

letter from Wu dated May 10, 1993, consisting of six single-spaced, typewritten pages. In the course of the letter, Wu described the contacts he had with some of the complaining policyholders. Wu further responded to the accusations that he had misrepresented the policies to the policyholders. In particular, Wu wrote:

> Among the 23 adults, 17 of them had Ph.Ds and M.Ds, 1 holds M.B.A., one engineer. All of them except for two hold graduate degrees. All adults hold college degrees. *This is a group of smart, professional people who try to out-smart the system.* (emphasis in original)
>
> Now let me respond to the lies of me misrepresenting the policy to them.
>
> In all of theses cases, CASS illustration was prepared and well-explained to them. Each initial sales interview took between three to five hours. All policies were delivered to them in person while I explained the policy page by page to them. A typical delivery took two hours.

> \*    \*    \*    \*    \*    \*

> The accusation of them being misled into buying L95 because it was misrepresented as the best investment was ridiculous.... I always told them that they could not dream on 'making rich quickly' with a life insurance policy as they could with other investments.... The fact is, these people were sophisticated investors who were well informed of other investment options and were participants in the market before they even knew me....

> \*    \*    \*    \*    \*    \*

> There was no deliberate confusion of dividends and cash values.... CASS illustration showed them very clearly the mathematical relationship and movement between premium and cash value. There is absolutely no logical or mathematical basis for anyone to believe that dividend could be cashed after a couple years without affecting the total net payment. This is again a sheer fabrication.
>
> Financial need analysis was done in each individual case when I prepared my presentation before the initial interview....

> \*    \*    \*    \*    \*    \*

> In summary, this is not about the policy. This is about a couple of individuals with personal vendetta against me who ... managed to unify some others who did not want to be left out for free insurance opportunities. Jealousy over my financial success and bitter feelings towards my efforts to Americanize them and to incorporate those individuals into mainstream U.S.A. I always told them that they have benefitted greatly from this country to become prosperous. They did not even pay tax for years. It was not too much to ask for them to have loyalty toward the U.S. Unfortunately, they only have loyalties to themselves ...

> \*    \*    \*    \*    \*    \*

> I helped almost every member of this group. My help to them included ... help their family members to come over through my friends in the U.S. Senate and Congress.... My wife and I even offered to foster the children fully at our expense when some of them decided to send their kids back to China because it was a "burden to their busy schedule here in the U.S." This is the same group of people who used to call me even 12:00 a.m. to ask advises on things that had nothing to do with insurance. I did not mind then as I thought they needed my help. Now I realized that they were just taking advantage of me. One of my clients, whom this group failed to recruit, ... called me and told me to ignore these people as they were still "Red Guards" from the Chinese Cultural Revolution that happened when these people were teenagers. (Red Guards were high school students.) The Cultural Revolution in China destroyed the moral standards and taught people to distrust and only have loyalties to themselves as it was common even for husbands to report on wives, fathers to report on sons to authorities. They are part of an atheistic culture.
>
> They also learned that a lie repeated a hundred times could become truth. They have already started a campaign to discredit me....

... I strongly urge Metlife to go after these liars....

On May 27, 1993, Dong Li, on behalf of all appellants, filed a Consumer Complaint Report with the Missouri Department of Insurance. The "reason for the complaint" was listed as "Unfair treatment." In the space for describing "details of complaint" on the complaint form, Li stated:

We recently discovered that the agent in MetLife Co. misrepresented the L–95 policy which we, 31 people, all bought during 1991–1992. Because the St. Louis Branch office could not solve our problem, we wrote to the high level office of MetLife Co. We did not get any thing or hear or any word.

A copy of the letter which appellants had sent to MetLife's CEO was attached to the consumer complaint report form. The following day, the Department forwarded a copy of appellants' consumer complaint to MetLife. The Department stated:

Pursuant to Section *374.190 RSMo 1986,* we are requesting a detailed letter, in duplicate, explaining the company's position with regard to this matter. Please provide in your explanation sufficient information to determine your company's compliance with all applicable provisions of Missouri Department of Insurance Regulation 20 CSR 100–1.050. (emphasis in original)

\*   \*   \*   \*   \*   \*

Pursuant to 374.190, you *must send* all records or documents, including medical records necessary to support any and all statements made in the response. Replies received without supporting documents will not be in compliance with 20 CSR 100–1.050. (emphasis in original)

On July 28, 1993, a consumer relations correspondent for MetLife wrote a letter to the Department in response to its letter of May 28. The consumer relations correspondent, responding to appellants' misrepresentation complaints, stated that the terms of each plan were explained to each policy owner at the time of the policy sale, and that Wu delivered the policies to each owner and explained the policy page by page to them. The consumer relations correspondent fur-

ther explained that the face page of every policy contained the "10–day Right to Examine Policy clause," in which a policyholder could cancel the policy within ten days and receive a refund if the policy was unacceptable. The correspondent noted that the fact that none of the policyholders exercised this option indicated that the policyholders had accepted the policies and their terms. The correspondent concluded that based on the information received from their local office, the policies were sold in good faith, and there was no evidence of misrepresentation. A copy of the branch manager's and Wu's letter were attached for the Department's review.

On December 14, 1993, appellants filed suit against MetLife and Wu alleging fraudulent misrepresentation in the sales of the policies. After dismissing Wu from the lawsuit, appellants filed a third amended petition which included a libel claim on September 3, 1996. The third amended petition, in addition to the fraudulent misrepresentation count, contained two additional counts. In Count II, appellants alleged that they had been libeled by the letter sent by MetLife to the Department in which Wu stated that appellants 1) were disloyal to the United States; 2) were "Red Guards" from the Chinese Cultural Revolution; 3) destroyed moral standards; 4) were part of an atheistic culture; 5) tried to out-smart the system; and 6) were liars.

MetLife filed a motion for summary judgment with respect to the libel claim, asserting that a response to an inquiry made by the Department, in the course of an investigation, was absolutely privileged. MetLife further asserted that the statements contained in Wu's letter were not libelous in that they were statements of opinion. MetLife also filed a motion to dismiss the libel claim asserting, among other things, that the claims of some of the appellants who joined in the libel count for the first time in 1996, were barred by the statute of limitations.

The trial court entered summary judgment for MetLife, holding that the investigation by the Department into the complaints of the policyholders was a proceeding of a quasi-judicial body, and therefore, the statements contained in the May 10, 1993 letter were

absolutely privileged. In particular, the trial court stated:

> The statements made to the Department in response to its investigation were absolutely privileged, if they were relevant to the MetLife's inquiry. The statements contained in Wu's letter were relevant to the Department of Insurance's inquiry into the policyholders' complaints about the L–95 policies and misrepresentations because the letter stated Wu's version of the situation surrounding the purchase of the L95 policies, the representations he claims to have made to these complaining policyholders, and although farfetched, the reasons why he believed the Plaintiffs are making complaints against him and Met-Life.

The trial court stated that there was no just reason for delay, and the summary judgment on the libel claim was final for the purposes of appeal. This appeal follows.

In their sole point, appellants argue that the trial court erred in holding that the entire contents of Wu's letter, transmitted to the Department by MetLife, were absolutely privileged because those portions which were defamatory were not relevant to the inquiry initiated by the Department. Appellants contend that Wu's false and malicious statements that they were "Red Guards" and disloyal to the United States were foreign to the issue of whether Wu had misrepresented the insurance policies he sold, and therefore, MetLife should not have been afforded an absolute privilege for republishing the defamatory statements. We disagree.

When considering an appeal from an order granting summary judgment, we view the record in the light most favorable to the party against whom judgment was entered. *ITT Commercial Finance Corp. v. Mid–America Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). Facts set forth by affidavit or otherwise in support of a party's motion are taken as true unless contradicted by the non-moving party's response. We accord the non-moving party the benefit of all reasonable inferences from the record. *Id.*

■ It is the established law of Missouri that statements made during proceedings of a judicial or quasi-judicial body are absolutely privileged if they are relevant to the issues before the body. *Remington v. Wal–Mart Stores, Inc.*, 817 S.W.2d 571, 574 (Mo.App. 1991); *Barchers v. Missouri Pacific Railroad Co.*, 669 S.W.2d 235, 238 (Mo.App.1984). In determining whether a proceeding is a quasi-judicial proceeding, the following criteria is used: whether the agency possesses traditional powers, such as being able to conduct hearings at which witnesses may be summoned and examined, subpoena documents, and hand down judgments. *Remington*, 817 S.W.2d at 574.[1]

■ In the case at bar, MetLife sent its response, along with the May 10 letter of Wu, at the request of the Department. Section 374.010 et seq., RSMo 1994[2], lists the general powers of the Department. Section 374.010 provides that the Department shall be charged with the execution of all laws related to insurance. Section 374.190 provides the director of the Department with the power to "examine and inquire into all violations of the insurance laws of the state" and to "inquire into and investigate the business of insurance transacted in this state by any insurance agent, broker, agency or insurance company." Section 374.190.2 provides that the director or his agents may "administer oaths or affirmations, and shall have power to summon and compel the attendance of witnesses, and to require and compel the production of records, books, papers, contracts or other documents, if necessary." In addition, the director may "issue cease and desist orders whenever it appears to him upon competent and substantial evidence that any person is acting in violation of any

---

1. In determining whether an agency possesses quasi-judicial power so as to warrant invocation of a privilege, the factors to be considered are "whether it is vested with discretion based upon investigation and consideration of evidentiary facts, whether it is entitled to hold hearings and apply rules of law to ascertain facts, and whether

its powers affects the personal or property rights of private persons." 53 C.J.S. *Libel & Slander*, section 72 (1987).

2. All citations are to the 1994 Revised Statutes of Missouri unless otherwise indicated.

law of this state or any rule or regulation promulgated by the director relating to the business of insurance." Section 374.046. The director also has the power to order forfeitures against persons for violation of the laws regulating the insurance business. Section 374.280.

We are of the opinion that the investigation by the Department into appellants' complaints was a proceeding of a quasi-judicial body. The Department of Insurance has the power to examine witnesses, compel the attendance of witnesses, conduct hearings, and compel the production of documents. *See, Parrillo, Weiss, & Moss v. Cashion,* 181 Ill. App.3d 920, 130 Ill.Dec. 522, 537 N.E.2d 851 (1st Dist.1989)(Court held that Department of Insurance had power to act as a quasijudicial body, and that a letter sent to it requesting an investigation of an insurance company was a preliminary step to a quasi-judicial proceeding, and therefore, the letter was absolutely privileged).

Appellants do not contest the trial court's holding that the Department's investigation into their complaints was a proceeding of a quasi-judicial body. Instead, appellants argue that certain portions of the letter which were defamatory, were not relevant to the inquiry initiated by the Department.

■ In recognition of the necessity of providing for the free flow of information, Missouri courts have not imposed a strict relevancy test in determining whether statements made in the judicial or quasi-judicial process are entitled to absolute immunity, rather, courts provide for absolute immunity if the statement made during the course of a proceeding has some relation to the proceeding. *Wright v. Truman Road Enterprises, Inc.,* 443 S.W.2d 13, 16 (Mo.App.1969); *See also, Barchers,* 669 S.W.2d at 238 (relevance is liberally construed); *Pape v. Reither,* 918 S.W.2d 376, 381 (Mo.App.1996)( relevance merely means "connected with" and no concepts of evidentiary admissibility are implicated). Discussing what is meant by whether a statement is relevant to an issue before a judicial or quasi-judicial body, the appellate court in Kansas City stated:

There is difficulty in determining in some cases what is relevant or pertinent. In determining the question the courts are liberal, and the privilege embraces anything that may possibly be pertinent. All doubt should be resolved in favor of its relevancy or pertinency. * * * *

The matter to which the privilege does not extend must be so palpably wanting in relation to the subject matter that no reasonable man can doubt its irrelevancy.

*McGinnis v. Phillips,* 224 Mo.App. 702, 27 S.W.2d 467, 469 (1930) (citation omitted).

■ The statements at issue were relevant to the inquiry by the Department. Appellants' complaints of Wu's misrepresentation were the subject matter of the Department's investigation. As part of its investigation, the Department directed MetLife to respond to appellants' allegations and provide it with all records and documents to support MetLife's response. Wu's letter, which MetLife had obtained prior to the Department's request as part of its own internal inquiry, provided Wu's description of his sales practices and a detailed account of the events immediately preceding the filing of appellants' complaint. Wu's reference to appellants as "Red Guards" and being disloyal to the United States explained why he believed the appellants were making complaints against him and MetLife.

As we find the statements contained in Wu's letter were relevant to the Department's investigation, the alleged defamatory statements were absolutely privileged.

The judgment of the trial court is affirmed.

CRANE, P.J., and HOFF, J., concur.