**Rhonda Entwistle and Megan DRURY, Respondents,**

v.

**MISSOURI YOUTH SOCCER ASSOCIATION, INC., et al., Appellants.**

No. ED 88731.

Missouri Court of Appeals, Eastern District, Division One.

July 8, 2008.

Scott J. Dickenson, St. Louis, MO, for appellants.

Michael McCrary, Columbia, MO, pro se.

Joseph L. Green, St. Louis, MO, for respondents.

ROBERT G. DOWD, JR., Judge.

The Missouri Youth Soccer Association, Inc. ("MYSA") and Michael McCrary ("McCrary") (collectively "Defendants") appeal from the judgment in favor of Rhonda Entwistle ("Entwistle") and Me-

gan Drury ("Drury") (collectively "Plaintiffs") on their separate claims. Most of MYSA's claims involve Plaintiffs' alleged failures to present submissible cases for their recoveries. In particular, MYSA argues the trial court erred in denying MYSA's motions for directed verdict and for judgment notwithstanding the verdict with respect to Entwistle's claim for wrongful discharge, Entwistle's claim for punitive damages based on her claim for wrongful discharge, and Drury's breach of contract claim. MYSA also argues Drury's breach of contract claim fails because the alleged contract was barred by the statute of frauds. In his separate appeal, McCrary argues the trial court erred in denying his motions for directed verdict and for judgment notwithstanding the verdict with respect to Drury's claim for personal injuries against him because her claim was barred by the expiration of the two-year statute of limitations in Section 516.140, RSMo 2000.[1] We affirm in part and reverse in part.

This case arose from an incident between Drury and McCrary and the MYSA Board of Directors' ("the Board") subsequent handling of the matter. MYSA is a youth soccer association whose purpose is to develop, teach, and promote the game of soccer for Missouri's youth. Plaintiffs had both been employees of MYSA. Entwistle began working for MYSA as the office manager in 1994, and she eventually was promoted to become the administrative/executive director of MYSA before she was discharged in 2001. Drury spent the summers and winter breaks of her freshmen and sophomore years in college in 1996 and 1997 working in the office at MYSA.

When Drury first began working for MYSA in 1996, she was nineteen years of age. While Drury was working in the summer of 1996, McCrary, who was then vice president of MYSA, had occasion to be in the office on numerous occasions. Drury testified that McCrary "kept asking [her] out," and she repeatedly "shrugged off" these inquiries. Then, Drury testified, when she was standing at the copier one day, McCrary walked by and took "his hands and slap[ped][her] on the behind and [said] get to work." Drury testified that immediately after this incident she went into a corner and began crying. Entwistle then tried to console Drury and told her she could go home early, which she did.

Entwistle testified that shortly after the incident she called Tony Kuester ("Kuester"), the president of MYSA when the incident occurred, and told him "this was going to be an issue for MYSA, [and the Board was] going to have to deal with it." Subsequently, Entwistle acted, on her own volition, as a liaison between Drury and her mother and the Board. After the Board considered the matter, Entwistle apparently informed Drury that McCrary had resigned from the Board and was never again to be allowed on the Board. Drury testified that in deciding not to take legal action against MYSA with respect to the incident involving McCrary, she relied on the promise, communicated through Entwistle, of Kuester that McCrary would resign from the Board and would not return.

Subsequently, at a social function in 2000, Drury learned McCrary was again serving on the Board. After learning this, Drury sent a letter to Geoff Butler ("Butler"), who was then president of MYSA, complaining that McCrary's service on the Board was in violation of previous representations made to her.

In response to Drury's letter, the Board discussed and eventually voted five to four to hold a hearing on the matter.[2] Entwis-

---

1. All further references are to RSMo 2000 unless otherwise indicated.

2. McCrary abstained from the vote.

tle testified at the hearing regarding the incident between McCrary and Drury and the alleged agreement according to which Drury agreed not to pursue the matter further because McCrary resigned from the Board and would not return to the Board. Entwistle also testified that she informed certain members of the Board of the alleged agreement when McCrary rejoined the Board.

After the hearing, McCrary was found guilty of misconduct for the incident between him and Drury. However, the Board decided McCrary would be allowed to remain Central District Commissioner, which also made him a Board member, because the Board concluded he had already been punished by having to resign in 1996 and it would be inappropriate to punish him again for the same conduct. The Board also noted "there was no evidence that [the Board] formally or informally made conditions concerning [McCrary's] right to membership or rights granted to a member of [MYSA] including those concerning holding office at either the state or district level."

Subsequently, Butler began the process of taking the issue of McCrary's removal to MYSA's full membership for a vote because the Board had decided not to remove him, and Butler was concerned that MYSA could incur liability for McCrary's conduct. Before the issue went to the full membership for a vote, McCrary resigned. Nevertheless, MYSA's membership passed a decision at the Annual General Meeting ("AGM") to prohibit a Board member from returning to the Board if he or she was found guilty of misconduct.

Entwistle later contended that after she testified, the Board began to take retaliatory action against her by finding deficiencies in her performance, which had previously been rated good to excellent. Entwistle went on medical leave due to stress/depression and hypertension on March 15, 2001. While she was on leave, her position of administrative/executive director was eliminated by the Board, but the Board offered her the new position of director of operations. The duties of the director of operations included "securing additional sponsorships for the [MYSA]." Although the hours for the new position remained the same, Entwistle's earnings became contingent on the amount of sponsorships she sold and her base salary without these commissions was substantially lower than what she had been earning in her previous position. Entwistle and MYSA were unable to agree on the terms of the director of operations position, and Entwistle was not re-hired for that position.

Thereafter, Entwistle and Drury filed suit against MYSA, McCrary, and four other Board members in their individual capacities alleging thirteen causes of action. By the time this action went to trial, the remaining causes of action were Entwistle's claim for personal injuries as a result of sexual battery against McCrary, Entwistle's claim for wrongful discharge against MYSA and McCrary, Drury's claim for personal injuries as a result of sexual battery against McCrary, and Drury's claim for detrimental reliance/breach of agreement against MYSA and McCrary.

MYSA moved for directed verdicts at the close of Entwistle and Drury's case and at the close of all evidence. McCrary moved for directed verdicts at the close of Drury and Entwistle's evidence. All of these motions for directed verdicts were denied.

Thereafter, the jury found Entwistle was wrongfully discharged and had sustained $75,000 in actual damages and $75,000 in punitive damages. However, the jury found in favor of McCrary on Entwistle's claim for personal injuries against him. With respect to Drury's

claim for breach of agreement, the jury found in her favor and assessed her damages at $30,000. Lastly, on Drury's claim for personal injuries against McCrary, the jury found for Drury and assessed her damages at $20,000 in actual damages and $40,000 in punitive damages. The trial court entered its judgment on all of these claims in accordance with the jury verdicts.

Subsequently, McCrary filed a motion for judgment notwithstanding the verdict or for a new trial on Drury's claim for personal injuries against him. MYSA also filed a motion for judgment notwithstanding the verdict or for a new trial on Entwistle's wrongful discharge claim and Drury's breach of contract claim. The trial court denied both of these motions. This appeal follows.

 We review a trial court's denial of a motion for judgment notwithstanding the verdict and a motion for directed verdict the same way; we must determine whether the plaintiff made a submissible case. *Hodges v. City of St. Louis,* 217 S.W.3d 278, 279–80 (Mo. banc 2007). A case cannot be submitted unless each and every fact essential to liability is predicated upon legal and substantial evidence. *Rush v. Senior Citizens Nursing Home Dist. of Ray County,* 212 S.W.3d 155, 158 (Mo.App. W.D.2006). To determine whether evidence was sufficient to support the jury's verdict, we view the evidence in the light most favorable to the result reached by the jury, giving the plaintiff the benefit of all reasonable inferences and disregarding evidence and inferences that conflict with that verdict. *Id.* We will reverse the jury's verdict for insufficient evidence only when there is a complete absence of probative fact to support the verdict. *Id.* Where the issue is a question of law, we review the trial court's conclusions *de novo.* *Hodges,* 217 S.W.3d at 280.

## I. The Submissibility of Entwistle's Claim for Wrongful Discharge

In its first point, MYSA argues the trial court erred in denying MYSA's motions for directed verdict and for judgment notwithstanding the verdict with respect to Entwistle's claim for wrongful discharge because there was not sufficient evidence that MYSA discharged Entwistle as a result of Entwistle "acting in a manner public policy would encourage." MYSA contends Entwistle's participation in a hearing to discern whether MYSA agreed never to allow McCrary back onto the Board is not a sufficiently definite protected activity recognized under Missouri law to qualify for this exception to the at-will employment doctrine.[3]

### a. Exceptions to the At–Will Employment Doctrine

 During her time working for MYSA, Entwistle never had an employment contract. Thus, she was an at-will employee. *Dunn v. Enterprise Rent–A–Car Co.,* 170 S.W.3d 1, 6 (Mo.App. E.D. 2005). Missouri's employment-at-will doctrine has historically allowed an employer to discharge an at-will employee, for cause or without cause, without liability for wrongful discharge, so long as the employee is not otherwise protected by a contrary statutory provision. *Sivigliano v. Harrah's North Kansas City Corp.,* 188 S.W.3d 46, 48 (Mo.App. W.D.2006). How-

3. Initially, we note that MYSA attempts to limit the purpose of the hearing to a determination of whether or not MYSA agreed never to allow McCrary back onto the Board. However, it is clear from testimony at the hearing, including that of Entwistle, and the decision made after the hearing that the purpose of the hearing was twofold: (1) to determine whether McCrary was guilty of misconduct; and (2) to determine whether there was an agreement to never allow McCrary to serve on the Board again.

ever, Missouri courts have recognized certain exceptions to the employment at-will doctrine. *Dunn*, 170 S.W.3d at 6. The public policy exception establishes a cause of action for an at-will employee who has been discharged by an employer in violation of a clear mandate of public policy. *Id.* The source of public policy is found in the letter and purpose of a constitutional, statutory, or regulatory provision or scheme, in the judicial decisions of state and federal courts, in the constant practice of government officials, and, in certain instances, in professional codes of ethics. *Boyle v. Vista Eyewear, Inc.*, 700 S.W.2d 859, 871 (Mo.App. W.D.1985). An at-will employee has a cause of action for wrongful discharge if he or she was discharged for: (1) refusing to perform an act contrary to a strong mandate of public policy or an illegal act; (2) reporting wrongdoing or violations of law or public policy by the employer or fellow employees to superiors or third parties; (3) acting in a manner public policy would encourage; or (4) filing a workers' compensation claim. *Porter v. Reardon Mach. Co.*, 962 S.W.2d 932, 936–37 (Mo.App. W.D.1998).

### 1. Entwistle's Claim under the Third Public Policy Exception

In her petition, at trial, and in her arguments on appeal, Entwistle limits her claim to the third public policy exception to the at-will employment doctrine—acting in a manner public policy would encourage.

Entwistle asserted in her petition that her discharge "was a direct and proximate result of [her] reporting and testifying to sexual harassment of female employees within [MYSA]." Further, the trial court submitted her claim using the following language:

> Your verdict must be for plaintiff Entwistle if you believe:
>
> First, plaintiff Entwistle was employed by defendant MYSA, and
>
> Second, plaintiff Entwistle testified as to sexual misconduct, and
>
> Third, defendant MYSA discharged plaintiff Entwistle, and
>
> Fourth, the exclusive cause of such discharge was plaintiff's testimony as to sexual misconduct, and
>
> Fifth, as a direct result of such discharge plaintiff sustained damage.

Thus, Entwistle's claim is essentially that she was wrongfully discharged because she testified at the hearing regarding McCrary's sexual misconduct, which as discussed below falls under the third exception.[4]

### b. The Public Policy of Protecting Witnesses

#### 1. Trials

 The third public policy exception includes acts such as performing jury duty, seeking public office, or joining a labor union. *Porter*, 962 S.W.2d at 937.

---

4. Only one of the cases cited by MYSA to support its contention that Entwistle did not qualify for the third public policy exception actually deals with the third public policy exception. In that case, the plaintiff argued she was discharged "for violating (or for initially refusing to violate, or for blowing the whistle on her supervisor's order to violate) the company policy" against sexual harassment in the workplace. *Sivigliano v. Harrah's North Kansas City Corp.*, 188 S.W.3d 46, 48 (Mo.App. W.D.2006). The plaintiff contended her discharge was in violation of the first three public policy exceptions to the at-will doctrine. *Id.* However, the court found the plaintiff did not qualify for an exception to the at-will employment doctrine because she only alleged facts regarding her company's policy and this was insufficient to prove her discharge was in violation of a clear mandate of public policy. *Id.* at 49. In this case, Entwistle asserts she was discharged as a result of her testimony at the hearing, which, under certain circumstances, would be in clear contravention of well-defined public policies regarding the testimony of witnesses.

However, this list is not exclusive; well-defined public policies encourage acting in other manners. For instance, it is well-settled that public policy requires that witnesses at trials shall not be restrained by the fear of being vexed by reprisals from those who are dissatisfied with their testimony. *Laun v. Union Elec. Co. of Mo.,* 350 Mo. 572, 166 S.W.2d 1065, 1072 (1942). As a result, the testimony of witnesses at trials is privileged in order to promote the most thorough investigation in courts of justice. *Id.* The United States Supreme Court has noted:

> [t]he danger of witness intimidation is particularly acute with respect to current employees-whether rank and file, supervisory, or managerial-over whom the employer, by virtue of the employment relationship, may exercise intense leverage. Not only can the employer fire the employee, but job assignments can be switched, hours can be adjusted, wage and salary increases held up, and other more subtle forms of influence exerted.

*NLRB v. Robbins Tire & Rubber Co.,* 437 U.S. 214, 240, 98 S.Ct. 2311, 57 L.Ed.2d 159 (1978). Thus, a witness' testimony at a trial is encouraged by public policy, and the third public policy exception to the at-will employment doctrine affords potential protection for certain at-will employees who are discharged as a result of their testimony at a trial.

■■■ Although the hearing at issue in this case is not a "trial" as contemplated by the above cases, we must determine, nonetheless, whether Entwistle's testimony at the hearing is also protected. We believe one of the key factors to be considered in determining whether testifying at a particular hearing is acting in a manner public policy would encourage is whether some degree of privilege attaches to a witness' testimony at the particular proceeding. In other words, the presence of a

privilege for testimony at a hearing is indicative of the well-established public policy in favor of protecting witnesses. *See Murphy v. A.A. Mathews, a Div. of CRS Group Engineers, Inc.,* 841 S.W.2d 671, 677 (Mo. banc 1992) (noting immunity is granted in very limited situations only when the underlying public policy considerations so demand).

### 2. Quasi–Judicial Proceedings

■■■ However, the policy of protecting witnesses for their testimony does not only apply to trials and judicial proceedings, but also extends to certain quasi-judicial proceedings. Quasi-judicial proceedings are commonly encountered in two main contexts. First, the proceedings before public agencies and administrative bodies are treated as quasi-judicial. Second, the proceedings before tribunals or bodies of voluntary associations can be treated as quasi-judicial. Initially, we note Entwistle asserts in her brief that MYSA is a voluntary association, and MYSA did not contest this designation, but rather only argues about the consequences of such a designation. Thus, if the current case involves a quasi-judicial proceeding, it would qualify under the second category because the hearing was held by MYSA, a voluntary association, and did not involve any public agencies or administrative bodies.

It has been held that statements made during proceedings of a judicial or quasi-judicial body are absolutely privileged if they are relevant to issues before the body. *See Remington v. Wal–Mart Stores, Inc.,* 817 S.W.2d 571, 574 (Mo.App. S.D.1991) (affording absolute privilege to communications in the context of the quasi-judicial proceedings of an administrative agency) *and Li v. Metropolitan Life Ins. Co., Inc.,* 955 S.W.2d 799, 803 (Mo.App. E.D.1997) (affording absolute privilege to

statements in a proceeding before the Department of Insurance).

█ There is some authority for the view that "quasi-judicial decision[s] reached by a tribunal of a private [or voluntary] association may not be entitled to exactly the same measure of respect as a similar decision of a duly constituted public agency." *Holder v. California Paralyzed Veterans Association,* 114 Cal. App.3d 155, 162, 170 Cal.Rptr. 455 (1980); *see also Zoneraich v. Overlook Hospital,* 212 N.J.Super. 83, 514 A.2d 53, 61 (1986). These differing measures of respect are demonstrated by the absolute privilege accorded in the proceedings in *Remington* and *Li,* which were quasi-judicial proceedings before administrative bodies, as opposed to cases involving quasi-judicial proceedings of voluntary associations where only a qualified privilege was given.[5] However, even in cases involving quasi-judicial proceedings of private or voluntary associations, it is well-established that some degree of privilege is given to witnesses.

### A. Voluntary Associations

As noted above, the hearing MYSA conducted was not a judicial proceeding or a quasi-judicial proceeding of a duly constituted public agency or administrative body; however, we must determine whether the hearing MYSA conducted was a proper quasi-judicial proceeding of a voluntary association.

█ Courts have commonly treated similar hearings held by similar voluntary associations as quasi-judicial in nature. *See Letendre ex rel. Letendre v. Missouri State High School Activities Ass'n,* 86 S.W.3d 63, 66 (Mo.App. E.D.2002) (treating a hearing before the Missouri State High School Activities Association as quasi-judicial) *and Shapiro v. Butterfield,* 921 S.W.2d 649, 652 (Mo.App. E.D.1996) (treating a hearing where a graduate student was censured by the National Association of Social Workers as quasi-judicial) *and Holder,* 114 Cal.App.3d at 165, 170 Cal. Rptr. 455 (treating a hearing where the treasurer was expelled from membership in the California Paralyzed Veterans Association as quasi-judicial). The decisions of any kind of a voluntary association, in admitting members, and in disciplining, suspending or expelling them, are of a quasi-judicial character. *Galvin v. Brotherhood of American Yeoman,* 209 Mo.App. 180, 232 S.W. 1058, 1060 (1921).

█ In these types of cases, courts have routinely given deference to the quasi-judicial actions of voluntary associations and have limited their review to determining: (1) whether there are inconsistencies between the association's charter and by-laws and any action taken in respect to

---

**5.** *See Warren v. Pulitzer Pub. Co.,* 336 Mo. 184, 78 S.W.2d 404, 414 (1934) (holding that a trial before a church body or other voluntary association is a quasi-judicial proceeding and that there may be a qualified privilege to report such proceedings just as in the case of proceedings before courts of justice) *and Farnsworth v. Storrs,* 59 Mass. 412, 416 (1850) (noting the proceedings of the church are quasi-judicial, and therefore those who complain, or give testimony, or act and vote, or pronounce the result, orally or in writing, acting in good faith, and within the scope of the authority conferred by this limited jurisdiction, and not falsely or colorably, making such proceedings a pretence for covering an intended scandal, are protected by law) *and Pulliam v. Bond,* 406 S.W.2d 635, 641 (Mo. 1966) (noting a qualified privilege attaches to statements and communications made in connection with the various activities of such organizations as lodges, societies, labor unions, etc., and it is well settled that members of such bodies may prefer charges against fellow members, offer testimony in support of the charges, and make proper publication of any disciplinary action that may be taken, without liability for any resultant defamation, so long as they act without malice.)

them; (2) whether a member has been treated unfairly, i.e., denied notice, hearing, or an opportunity to defend; (3) whether the association undertakings were prompted by malice, fraud or collusion; and (4) whether the charter or bylaws contravene public policy or law. *Letendre,* 86 S.W.3d at 66. The rationale behind the deference we give to the quasi-judicial actions of voluntary associations has been explained as follows:

> No one is compelled to join. Members go in voluntarily, and, doing so, a member has no right to complain to the courts of what he may consider an unnecessarily harsh rule or severe penalty, but which the majority of the members in adopting have decided is in the interest of the body. If he does not wish to abide by the rules regularly enacted by the association, he should refrain from joining, or, if already a member, should withdraw. Remaining a member, it is his duty to obey the laws of the organization or suffer the consequences. And where the quasi judicial tribunals established under the constitution and bylaws for the determination of controversies among members and for the trial of offenses against the organic law follow the prescribed course of procedure, courts respect their judgments, and will not inquire into their reasonableness, nor consider whether a particular judgment is one which a court of law would have rendered. A member has no such property right in his membership as will entitle him to apply to the courts for relief against a judgment he thinks unjust.

■ *Moffatt v. Board of Trade of Kansas City,* 111 S.W. 894, 900 (Mo.App.1908). Therefore, while courts give deference to the quasi-judicial actions of voluntary associations, such associations are not free to violate the law of the land or transcend the limits of natural justice or the public policy of the state. *Id.* at 899.

■ Because MYSA is a voluntary association, we treat the hearing it set up to deal with disciplinary matters of its members as quasi-judicial. *Galvin,* 232 S.W. at 1060. Thus, a witness' testimony at such a hearing would be privileged, indicating that testifying would be acting in a manner public policy would encourage.

However, the standard of review for the quasi-judicial actions of voluntary associations shows courts will examine such proceedings to determine, among other things, whether a hearing was conducted in a manner inconsistent with the association's charter or bylaws or if the charter or bylaws contravene public policy or the law. *Letendre,* 86 S.W.3d at 66. In other words, not every meeting or "hearing" of a voluntary association would necessarily qualify as a quasi-judicial proceeding. However, a hearing provided for and conducted in accordance with the association's charter or bylaws to deal with disciplining, expelling, or suspending members is precisely the kind of hearing that has been traditionally held to be of a quasi-judicial character. *Galvin,* 232 S.W. at 1060. Thus, we will now examine the proceeding to determine whether it fits these criteria.

**B. The Hearing Conducted by MYSA**

In this case, Butler testified that when he became aware of the situation with Drury and McCrary in September of 2000, he requested that McCrary resign. McCrary declined that request so Butler and other Board members called for a formal hearing, as provided for in the bylaws, to determine whether McCrary was guilty of sexual misconduct and whether there was an agreement that prevented him from serving on the Board.

MYSA's bylaws provided "[a] District Commissioner or Alternate District Commissioner shall be removed from office by two-thirds (2/3) majority of the entire vot-

ing power of delegates from his/her District after a *hearing* has been held of all parties involved." The Board voted five to four to send the matter to a hearing with McCrary abstaining. Because McCrary was on the Board as the Central District Commissioner, the Central District held the hearing.

Bob Murray ("Murray"), a friend of McCrary's, was the Alternate District Commissioner for the Central District and was therefore in charge of setting up and holding the hearing. The hearing was to be an open hearing according to the by-laws. Both the Board and McCrary were notified that they had the right to have legal counsel present in order to advise the Board or McCrary. The Chair of the hearing was also allowed to have legal counsel present to advise him or her. Further, MYSA was allowed to appoint independent legal counsel to advise the Chair.

The rules of procedure also provided that the District Disciplinary Hearing Committee ("the Committee") shall be the District Counsel consisting of up to two delegates of each Central District member organization with one delegate from each member organization having the right to vote.

For the presentation of the case, the guidelines provided as follows:

a) Plaintiff will present case [ ].
b) Witnesses for the plaintiff will be called [ ], individually [ ]. Committee members to question plaintiff/witnesses as deemed necessary after each testimony has been presented. The questions are to be directed through the Chair.
c) Defendant will present case [ ].
d) Witnesses for the defendant will be called [ ], individually [ ]. Committee members to question defendant/witnesses as deemed necessary after each testimony has been presented.

The questions are to be directed through the Chair.
e) Any witnesses will be recalled as necessary [ ].
f) Plaintiff will make closing statement [ ].
g) Defendant will make closing statement [ ].
h) Open hearing adjourned. All parties excused. Committee to deliberate.

The rules of procedure also recommended that all written evidence be submitted in advance so it could be distributed to the Committee before the hearing. Further, all written evidence needed to meet certain criteria. Specifically, the secretary needed to sign minutes of meetings and they needed to be notarized with the secretary attesting they were the approved minutes. Also, all written testimony had to be signed and notarized.

The Chair also noted in the rules of procedure that MYSA's constitution and bylaws would be used as guidelines for the hearing. Moreover, the Chair also stated each individual would be entitled to due process and the fairest possible consideration regarding the situation.

The hearing was held on January 6, 2001. Butler testified at trial that as he was preparing for the hearing, he went to Entwistle and told her he wanted to call her as a key witness at the hearing. Entwistle responded that she did not want to lose her job as a result of her testimony, and she felt certain Board members would retaliate against her and find a way to fire her. Butler testified he reassured her that he would protect her and told her "she can't be fired for telling the truth and doing her duty to testify on this matter."

At the hearing, both Drury and Entwistle testified. Entwistle's testimony included details about the actual incident of sexual misconduct between McCrary and

Drury and also information about the subsequent handling of the matter and the alleged agreement to never allow McCrary on the Board again. In addition, Drury and Entwistle were cross-examined at the hearing by both McCrary and members of the Committee. Butler testified Drury was also brought in to testify at the hearing to substantiate the alleged sexual misconduct, to which McCrary was unwilling to stipulate. Further, Butler noted that at the end of the hearing a report of the proceedings was made and this report included minutes taken at the hearing. The Committee's report was entitled "Central District Disciplinary Hearing Committee and Central District League Representatives Decision in the case of Missouri Youth Soccer Association Board of Directors vs. Michael McCrary, MYSA Central District Commissioner." The Committee held by a vote of seven to one that McCrary was guilty of misconduct, and by a vote of eight to zero that McCrary need not be removed from the Board because McCrary was already forced to resign from the Board because of his conduct, and if he was removed after the hearing, he would be penalized twice for the same incident of misconduct.

In conclusion, we note in this case when a conflict arose between members of MYSA, the Board set up a body to determine the controversy. The Committee holding the hearing and its functions were established and mandated by MYSA's bylaws, and the hearing was conducted in accordance with the bylaws. Further, the hearing had rules of evidence, McCrary was allowed to present his case, and there were opportunities for cross-examination. Official minutes were taken at the proceeding, and the Committee issued a written decision explaining its decision. Thus, there were sufficient procedural protections in place to guarantee McCrary a fair hearing. Further, there is no evidence that the hearing was prompted by malice,

fraud, or collusion or that the bylaws contravened public policy or law. Therefore, we find the hearing was a proper quasi-judicial proceeding of a voluntary association. As a result, Entwistle's testimony, which was related to the issues before the body, was entitled to at least a qualified privilege, and the presence of a privilege is indicative of a public policy in favor of protecting witnesses at certain proceedings. Thus, Entwistle's discharge as a result of her testimony at the hearing violates well-established norms of public policy.

We find that by testifying as a witness at the hearing, Entwistle was acting in a manner public policy would encourage. MYSA could not discharge her for her testimony in the hearing without incurring exposure to liability for wrongful discharge. Accordingly, Entwistle's claim that she was wrongfully discharged because she was acting in a manner public policy would encourage was submissible as a matter of law.

**c. Facts Supporting the Submissibility of Entwistle's Claim for Wrongful Discharge**

■ Having found Entwistle's claim for wrongful discharge was submissible as a matter of law, we now turn briefly to the facts supporting her claim, which we view in the light most favorable to the result reached by the jury. *Rush,* 212 S.W.3d at 158. In September of 2000, Entwistle had just received a raise and promotion "in recognition for her doing a good job in the office." Butler also noted that in conducting the evaluation of Entwistle leading to that raise and promotion, he received "no negative input from anyone" and Entwistle met and exceeded the requirements of the position. Further, from the time of that promotion to the time of her discharge Entwistle's job performance was consis-

tently rated good to excellent. Entwistle was in charge of the Missouri Youth Soccer Association Classic and MYSA's Annual General Meeting ("AGM"), both of which occurred during that time period and were very successful.

Then Entwistle testified at the hearing on January 6, 2001. After the hearing, the Committee determined McCrary did not have to be removed from the Board. In response to that finding some Board members initiated a process to remove McCrary from the Board because they believed MYSA could incur liability for his misconduct if MYSA did not remove him. The result of this process was that MYSA's membership rendered a decision at the AGM, which stated "[a]ny member of the board of directors that is found guilty of misconduct will not be allowed to serve on the board of directors, to include both past and present members." McCrary resigned shortly before this decision was made. The record shows that after the AGM there was an effort by McCrary's friend, Murray, and other Board members to overturn this AGM decision, which would allow McCrary back on the Board.

At the same AGM on January 28, 2001, Bill Charles ("Charles") was elected president of MYSA. The week after he was elected president, Charles asked for evaluations of all employees, even though evaluations had been done six months earlier, the requested evaluations were inconsistent with MYSA's bylaws, handbook, and procedures, and MYSA had never conducted evaluations in this manner before. In the past, Entwistle had received good to excellent evaluations. However, the evaluation of Entwistle conducted on February 22, 2001 in response to Charles' request contained, for the first time, some deficiencies, and Charles told her she needed to show improvement by June of 2001. At this time, Murray remarked to Charles

that Entwistle should be fired as a result of her evaluation.

Subsequently, Entwistle, while on medical leave, was discharged when her position was eliminated, ostensibly for financial reasons, although there is no evidence that the Board discussed the financial rationale for eliminating Entwistle's position.

In sum, the record shows Entwistle had consistently received good to excellent evaluations with the most recent scheduled evaluation occurring in September of 2000. Then Entwistle testified at the hearing concerning McCrary's misconduct. Shortly thereafter, Charles conducted an unscheduled evaluation and found some deficiencies. Murray, McCrary's friend who began an effort to overturn the recent AGM decision that would allow McCrary to be on the Board again, immediately remarked that Entwistle should be fired. Eventually, Entwistle's employment was terminated purportedly for budgetary reasons, although there is no evidence that the Board discussed the budgetary implications of her discharge. We find there is sufficient evidence here for the jury to infer Entwistle was wrongfully discharged as a result of her testimony at the hearing.

Thus, the trial court did not err in denying MYSA's motions for directed verdict and for judgment notwithstanding the verdict with respect to Entwistle's claim for wrongful discharge because there was sufficient evidence that MYSA discharged Entwistle as a result of Entwistle "acting in a manner public policy would encourage." Point denied.

## II. The Submissibility of Entwistle's Claim for Punitive Damages

In its second point, MYSA argues the trial court erred in denying MYSA's motions for directed verdict and for judgment notwithstanding the verdict with respect to Entwistle's claim for punitive damages

based on her claim for wrongful discharge. MYSA maintains Entwistle failed to present clear and convincing evidence of culpable mental intent because the evidence showed MYSA eliminated Entwistle's position to save costs and gain greater accountability and Entwistle did not attempt to offer evidence beyond that required for retaliatory discharge, and further, punitive damages are to be applied sparingly. We disagree.

### a. Standard for Submission of Claim for Punitive Damages

Whether there is sufficient evidence to support an award of punitive damages is a question of law. *Hoyt v. GE Capital Mortg. Services, Inc.,* 193 S.W.3d 315, 322 (Mo.App.E.D.2006). We review the evidence presented to determine whether it was sufficient, as a matter of law, to submit the claim for punitive damages. *Id.* In doing so, we view the evidence and all reasonable inferences in the light most favorable to submissibility and we disregard all evidence and inferences which are adverse thereto. *Id.* Only evidence that tends to support the submission should be considered. *Id.* A submissible case is made if the evidence and the inferences drawn therefrom are sufficient to permit a reasonable juror to conclude that the plaintiff established with convincing clarity that the defendant's conduct was outrageous because of evil motive or reckless indifference. *Id.*

Punitive damages require clear and convincing proof of a culpable mental state, either from a wanton, willful, or outrageous act, or from reckless disregard for an act's consequences such that an evil motive may be inferred. *Brady v. Curators of University of Missouri,* 213 S.W.3d 101, 109 (Mo.App. E.D.2006). The necessary mental state is found when a person intentionally does a wrongful act without just cause or excuse. *Id.* When someone

intentionally commits a wrong and knew that it was wrong at the time, an evil motive and wanton behavior is exhibited. *Id.* An evil intent may also be inferred where a person recklessly disregards the rights and interests of another person. *Id.* Punitive damages are an extraordinary and harsh remedy and should be applied only sparingly. *Romeo v. Jones,* 144 S.W.3d 324, 334 (Mo.App. E.D.2004).

### b. Evidence Supporting Entwistle's Claim for Punitive Damages

In this case, the evidence viewed in the light most favorable to submissibility shows the week after Charles was elected president of MYSA, he asked for evaluations of all employees, even though evaluations had been done six months earlier, the requested evaluations were inconsistent with MYSA's bylaws, handbook, and procedures, and MYSA had never conducted evaluations in this manner before. In the past, Entwistle had received good to excellent evaluations. However, the evaluation of Entwistle conducted on February 22, 2001 in response to Charles' request contained some deficiencies, and Charles told her she needed to show improvement by June of 2001, which was just over three months later.

Subsequently, Entwistle went on medical leave. Entwistle noted that the locks were changed at the MYSA office while she was on leave. Also while Entwistle was on medical leave, Charles eliminated Entwistle's job and created a new position with revised responsibilities, which he then offered to Entwistle. To equal the $50,000 gross salary and benefits package she was making in her previous position, the new position required Entwistle to sell sponsorships on a commission basis. Carl Metzelthin, Jr. ("Metzelthin"), a Board member at the time, testified that he did not believe anyone had ever sold enough spon-

sorships to make up the difference between her previous salary and the base salary of the new position. In fact, Metzelthin testified no one had ever approached even twenty percent of the amount Entwistle would have had to sell to equal her previous salary. Metzelthin testified that ["the Board] knew it was [not] going to happen" referring to the possibility that Entwistle would sell enough sponsorships to equal her previous salary. Further, while the base salary for the new position offered to Entwistle was $32,000, the base salary of the secretary for that new position was $36,000.

Entwistle did not accept the offer Charles made for the new position. The new position was not filled after Entwistle was unable to come to an agreement with Charles on the position. When asked why the position was never filled, Metzelthin responded "I think they were offering her a position they knew she couldn't do."

Contrary to the assertions made by Charles that he eliminated Entwistle's previous position and offered her a new position with revised responsibilities as a cost saving measure, the record shows the Board discussion was limited to Entwistle's performance as reported from the recent performance evaluation ordered by Charles when it voted to eliminate her position. Further, Metzelthin testified there had been "no discussion on money at all" in relation to the elimination of Entwistle's previous position.

The above evidence is sufficient to show that there was a plan among some Board members to get rid of Entwistle, and it can reasonably be inferred that this plan resulted from Entwistle's testimony at the hearing on the incident involving McCrary. Thus, these Board members intentionally terminated her position. Then they created and offered Entwistle a new position they knew she would not be able to accomplish. These Board members intentionally committed a wrong and knew that they were doing so; thus, the jury could infer they had an evil motive. *Brady*, 213 S.W.3d at 109.

Therefore, we find in this case there was clear and convincing proof of a culpable mental state to support submitting a claim for punitive damages. Thus, the trial court did not err in denying MYSA's motions for directed verdict and for judgment notwithstanding the verdict with respect to Entwistle's claim for punitive damages based on her claim for wrongful discharge. Point denied.

## III. The Submissibility of Drury's Claim for Breach of Contract

In its third point, MYSA argues the trial court erred in denying MYSA's motions for directed verdict and for judgment notwithstanding the verdict with respect to Drury's breach of contract claim because Drury did not offer sufficient evidence to recover for breach of contract. In particular, MYSA argues: (1) Drury did not, and could not, offer evidence of an offer, an acceptance, and bargained for consideration; (2) Drury did not prove all terms of the alleged contract were sufficiently definite; (3) Drury did not form any alleged contract with any agent of MYSA who possessed authority to bind MYSA to a contract; and (4) Drury did not offer any competent evidence of damages stemming from the breach of the alleged contract. We agree.

### a. Necessary Elements for a Valid Contract

The essential elements of a valid contract are: offer, acceptance, and bargained for consideration. *State ex rel. Career Aviation Sales, Inc. v. Cohen*, 952 S.W.2d 324, 326 (Mo.App. E.D.1997). The parties must have a mutuality of assent or a meeting of the minds on these essential

terms of a contract. *Building Erection Services Co. v. Plastic Sales & Mfg. Co., Inc.,* 163 S.W.3d 472, 477 (Mo.App. W.D. 2005). The forbearance to enforce a legal right such as filing a lawsuit can constitute bargained for consideration. *See Holt v. Jamieson,* 847 S.W.2d 194, 197 (Mo.App. E.D.1993); *and Missouri Farmers Ass'n, Inc. v. Barry,* 710 S.W.2d 923, 926 (Mo. App. W.D.1986). On the other hand, an expression to gratuitously do something, which is unsupported by consideration or unaccompanied by some bargaining, is normally an unenforceable promise. *Cash v. Benward,* 873 S.W.2d 913, 916 (Mo.App. W.D.1994).

### b. Evidence of the Contract Drury Alleges

In this case, Drury testified that it was always her understanding that McCrary had been removed from the Board and was not to return. However, Drury never requested nor did she receive a written agreement to that effect. Metzelthin testified that he searched for a copy of the alleged agreement, but could not find one so he concluded there was not sufficient evidence to prove McCrary had agreed never to be on the Board again. Moreover, there is no evidence of a negotiation or even communication directly between MYSA and Drury, which precludes any meeting of the minds with respect to the contract terms Drury alleges. Drury's only communication with the Board was through Entwistle, and the evidence demonstrates Entwistle did not have the authority to bind MYSA to a contract. Entwistle told Drury from the outset she did not have authority to handle the matter and had to report it to the Board for its consideration. Entwistle also testified that "the only thing the Board ever instructed [her] to do . . . was after they had the conference call and decided to ask for [McCrary's] resignation, to tell [Drury] and her mom that he was resigning to leave the Board, never to return." There is no evidence that the Board took this action directly in response to any alleged promise by Drury not to pursue the matter further. Moreover, in the report after the hearing, the Committee noted "there was no evidence that the [Board] formally or informally made conditions concerning [McCrary's] right to membership or rights granted to a member of [MYSA] including those concerning holding office at either the state or district level." Thus, Drury failed to provide evidence of any discussion, offer, or acceptance with respect to the terms of the contract she alleges.

Further, because we find there was insufficient evidence to find that a contract existed between MYSA and Drury, we need not consider whether Drury sustained any damages from the breach of that alleged contract.

Therefore, the trial court erred in denying MYSA's motions for directed verdict and for judgment notwithstanding the verdict with respect to Drury's breach of contract claim because Drury did not offer sufficient evidence to recover for breach of contract. Point granted.

### IV. The Application of the Statute of Frauds to Drury's Claim for Breach of Contract

In its fourth point, MYSA argues the trial court erred in denying MYSA's motions for directed verdict and for judgment notwithstanding the verdict with respect to Drury's breach of contract claim because her claim was barred by the statute of frauds because the alleged contract was oral and for a period of time in excess of one year.

Having found Drury did not offer sufficient evidence to make a submissible case with respect to the existence of the contract she alleged was breached, we need not address whether the alleged contract

was in compliance with the statute of frauds.

## V. The Application of the Statute of Limitations to Drury's Claim for Personal Injuries

In his separate appeal, McCrary's sole point is the trial court erred in denying his motions for directed verdict and for judgment notwithstanding the verdict with respect to Drury's claim for personal injuries against him because her claim was barred by the expiration of the two-year statute of limitations in Section 516.140.

### a. Law Concerning the Statute of Limitations Defense

Section 516.140 provides that an action for battery must be brought within two years of the occurrence. Whether or not the statute of limitations applies to an action is a question of law that this Court reviews *de novo*. *Husch & Eppenberger, LLC v. Eisenberg*, 213 S.W.3d 124, 128 (Mo.App. E.D.2006). However, when contradictory or different conclusions may be drawn from the evidence as to whether the statute of limitations has run, it is a question of fact for the jury to decide. *Lomax v. Sewell*, 1 S.W.3d 548, 552–53 (Mo.App. W.D.1999).

### b. Analysis of McCrary's Statute of Limitations Defense

According to the record, it is undisputed that the battery in this case occurred in June of 1996. In response to Drury's petition, McCrary properly pleaded the statute of limitations as a defense, and he argued Drury needed to bring her claim for battery by June of 1998 before the two-year statute of limitations ran. Drury argued that the statute of limitations did not begin tolling until Drury found out McCrary had rejoined the Board thus violating the alleged agreement according to which Drury had refrained from bringing suit. McCrary argues that Drury still would

have had to file suit by August of 2002 because she found out he was on the Board again in August of 2000. Drury did not file her petition until March of 2003.

Further, Drury argues, in this case, there was no jury instruction dealing with the statute of limitations. The trial court noted that McCrary did not offer any written instructions, and McCrary stated he had "no concern with the instructions."

Where the opposing party admits the running of the statute of limitations, there is no question of fact on this issue for the jury to decide requiring an instruction thereon. *Lomax*, 1 S.W.3d at 553. When the running of the applicable statute of limitations is not admitted and turns on a jury question, a jury instruction is required, and the failure of the party relying on the defense to request an instruction on that issue constitutes an abandonment of that defense, even though it was properly pled. *Straub v. Tull*, 128 S.W.3d 157, 159 (Mo.App. S.D.2004). Generally, a directed verdict will not be granted to the party carrying the burden of proof; however, an exception to this general rule is recognized when plaintiff's own evidence establishes that recovery is barred by an affirmative defense. *Jerry Anderson & Associates, Inc. v. Gaylan Industries, Inc.*, 805 S.W.2d 733, 735 (Mo. App. W.D.1991).

In this case, the testimony and evidence of both parties establishes that the incident between McCrary and Drury occurred in June of 1996 and Drury did not file suit against McCrary for sexual battery until March of 2003. Drury asserts "the date of the battery and the damages she suffered from that battery are equivocal and contradictory" and relies on *Weaver v. African Methodist Episcopal Church, Inc.*, 54 S.W.3d 575, 586 (Mo.App. W.D.2001) for the proposition that McCrary had to establish facts meeting his

burden to show the statute of limitations had run. The *Weaver* case, however, is distinguishable from the current case. In *Weaver*, the court found the plaintiff's evidence was equivocal and contradictory in proving the date of the battery. *Id.* at 587. Despite her assertions to the contrary, Drury's evidence as to the date of the battery and her damages was not equivocal or contradictory. There is no factual question regarding whether the statute of limitations had run.

Further, because we concluded in the third point above that there was no contract between MYSA and Drury, Drury could not rely on such a non-existent contract to toll the statute of limitations. However, even assuming *arguendo* that Drury refrained from filing her suit because of an alleged agreement with MYSA and this agreement had the effect of halting the running of the statute of limitations, Drury's own evidence showed that she knew this agreement had been breached at the latest by October 3, 2000. Therefore, if the statute of limitations began to run on October 3, 2000, Drury's suit would still be time-barred because it was not filed until March of 2003.

In conclusion, there was no issue of fact for the jury regarding whether the statute of limitations had run and it was not necessary for McCrary to submit an instruction on that issue because Drury's own evidence established that recovery was barred by an affirmative defense.

Therefore, the trial court erred in denying McCrary's motions for directed verdict and for judgment notwithstanding the verdict with respect to Drury's claim for personal injuries against him because her claim was barred by the expiration of the two-year statute of limitations in Section 516.140. Point granted.

## VI. Conclusion

The trial court's judgment finding Entwistle was wrongfully discharged and sustained $75,000 in actual damages and $75,000 in punitive damages is affirmed. The trial court's judgment in favor of Drury on her claim for breach of contract is reversed. Further, the trial court's judgment in favor of Drury on her claim for personal injuries against McCrary is reversed.

KATHIANNE KNAUP CRANE, P.J., and KENNETH M. ROMINES, J., concur.