

# In the Missouri Court of Appeals
## Western District

JOHN KNOX VILLAGE, a Missouri Not-For-Profit Corporation, )
)
Respondent, )
)
v. )
) WD76708
FORTIS CONSTRUCTION COMPANY, )
LLC, ARMANDO DIAZ, TOM M. ) FILED: September 30, 2014
NADLER, DON S. NADLER & GARY P. )
RODENBERG, )
)
Appellants. )

## APPEAL FROM THE CIRCUIT COURT OF JACKSON COUNTY
### THE HONORABLE MICHAEL W. MANNERS, JUDGE

### BEFORE DIVISION ONE: MARK D. PFEIFFER, PRESIDING JUDGE,
### LISA WHITE HARDWICK AND KAREN KING MITCHELL, JUDGES

Fortis Construction Company, LLC, Tom Nadler ("T. Nadler"), Don Nadler ("D. Nadler"), Gary Rodenberg, and Armando Diaz (referred to collectively as "Appellants") appeal from a judgment ordering them to pay actual and punitive damages to John Knox Village ("JKV") on JKV's claim for fraudulent misrepresentation, fraudulent conveyance, and civil conspiracy. In their five points on appeal, Appellants contend: (1) the circuit court lacked subject matter jurisdiction over the claim; (2) the court's finding that T. Nadler, D. Nadler, and Rodenberg made fraudulent misrepresentations to JKV was not supported by the evidence; (3) the court misapplied the law in determining the amount of actual damages; (4) the court's finding that a civil conspiracy existed was not

supported by sufficient evidence and was against the weight of the evidence; and (5) the court's determination that punitive damages were warranted was not supported by sufficient evidence and was against the weight of the evidence. For reasons explained herein, we affirm.

## FACTUAL AND PROCEDURAL HISTORY

Fortis was a limited liability company engaged in general construction in Jackson County. Its members were Diaz, who was its president and had 52% ownership in the company, and T. Nadler, D. Nadler, and Rodenberg, who each had 16% ownership in the company. T. Nadler, D. Nadler, and Rodenberg were also owners of Triad Construction Company, Inc., another general construction company that had an office in the same building as Fortis. T. Nadler was the president of Triad, and D. Nadler and Rodenberg were vice-presidents. Each had a one-third ownership interest in Triad. Triad and Fortis frequently subcontracted work to each other.

In April 2010, JKV entered into a contract with Fortis in which Fortis agreed to provide construction and general contracting services on a project known as the PACU Project. In the contract, Fortis represented and warranted that anytime it would submit an application for payment to JKV, all work for which payment was requested would be free and clear of all liens, claims, or other encumbrances. Fortis also represented and warranted that it would timely pay any subcontractors that performed work on the PACU Project after it received payment from JKV.

Several months later, in October 2010, JKV contracted with Triad for construction services on another project known as the Hospice Project. Like Fortis in the PACU Project contract, Triad represented and warranted in the Hospice Project contract that

2

anytime it would submit a payment application to JKV, all work for which payment was requested would be free and clear of all liens, claims, or other encumbrances. Likewise, Triad represented and warranted that it would promptly pay any subcontractors that performed work on the Hospice Project after it received payment from JKV. The contract further provided that neither JKV nor its architect would have responsibility for payments to subcontractors. JKV considered these provisions material and relied upon them in deciding to contract with Triad.

Construction on the Hospice Project began immediately after construction on the PACU Project ended. In December 2010, Triad submitted its first application for payment on the Hospice Project to JKV. The application contained an itemized description of the work completed for which Triad was seeking payment. Triad represented that the current payment due was $68,787.90. In addition to the payment application, Triad submitted a notarized waiver of lien. In the waiver of lien, Triad represented that, upon payment by JKV of $68,787.90, Triad waived and released any and all liens and claims or rights of lien against the Hospice Project property. Shortly after submitting the payment application to JKV, Triad and Fortis, who was a subcontractor on the Hospice Project, asked JKV to sign a joint check agreement agreeing to make its check payable to both Triad and Fortis. The agreement provided that Triad's and Fortis's endorsement and deposit of the check discharged and waived any express or implied lien rights or derivative claims they might have against JKV for all amounts paid. JKV issued a joint check to Triad and Fortis for $68,787.90 on January 14, 2011.

3

Triad submitted its second application for payment on the Hospice Project to Triad on January 24, 2011. In this second application, Triad certified that the payment that JKV made in response to Triad's first application for payment had been used to pay for the work itemized in that application. Triad requested in the second application for payment that JKV pay $64,885.10, which represented the amount due for work done to complete the Hospice Project. Like the first application for payment, the second application was accompanied by a notarized waiver of lien in which Triad represented that, upon payment by JKV of the requested amount, Triad waived and released any and all liens and claims or rights of lien against JKV's Hospice Project property. This waiver of lien was denoted as the "final waiver of lien." Again, Triad and Fortis asked JKV to sign a joint check agreement with identical terms as the first joint check agreement. Because some materials were being delivered later, JKV deducted the cost of the materials from the amount requested in the second application for payment and issued a joint check to Triad and Fortis for $55,042.25 on February 10, 2011. A week later, JKV issued another joint check to Triad and Fortis for $469.08 for a change order. JKV paid Triad and Fortis a total of $124,299.23 for the Hospice Project.

On March 1, 2011, JKV's architect, John Wisniewski, learned that Fortis had not paid some of the subcontractors on the PACU Project. This prompted Wisniewski to look into whether Triad had paid the subcontractors on the Hospice Project. He discovered that none of the subcontractors on the Hospice Project had been paid and that $127,121.14 was owed to the subcontractors. Wisniewski wrote a letter to T. Nadler demanding that Triad pay all of the subcontractors on the Hospice Project. Triad did not do so.

4

Meanwhile, JKV began receiving notices that subcontractors were intending to file liens on the Hospice Project property. JKV contacted each subcontractor, except Fortis, to negotiate a payment amount to keep them from filing liens against the property. Although several subcontractors were willing to accept 70% of the subcontracted amount, one subcontractor demanded that it receive 100% of the subcontracted amount, while another demanded that it receive 90%. JKV paid another $70,373.78 directly to all of the Hospice Project subcontractors except Fortis.

On April 14, 2011, Triad filed a petition for Chapter 7 bankruptcy. In July 2011, Fortis filed a statement of mechanic's lien on the Hospice Project property, asserting that it was owed $36,456.92 plus interest for its work on the Hospice Project.[1]

In August 2011, JKV filed suit against Appellants. In its second amended petition, JKV asserted several claims against Appellants based upon their actions with regard to the PACU Project and Hospice Project. The only claim at issue in this appeal is JKV's Count III, which was a claim against all Appellants for fraudulent misrepresentation, fraudulent conveyance, and civil conspiracy involving the Hospice Project.

In Count III, JKV alleged that T. Nadler, D. Nadler, and Rodenberg were insiders and had complete control and dominion over non-party Triad and its business transactions and practices. JKV alleged that T. Nadler, D. Nadler, and Rodenberg, as Triad's owners, perpetrated fraud upon JKV, thereby allowing the corporate veil to be pierced to subject them to individual liability.

---

[1] After JKV filed this lawsuit, Fortis amended its statement of mechanic's lien to assert that it was owed only $1470.

5

JKV further alleged that T. Nadler, D. Nadler, and Rodenberg, as Triad's owners, intentionally made several representations that they knew were false and material and that JKV would rely upon in determining whether to enter into the Hospice Project contract. These false representations were that all work for which Triad requested payment would be free of all liens and that Triad would timely pay any subcontractors that performed work on the Hospice Project after receiving JKV's payments. JKV asserted that T. Nadler, D. Nadler, and Rodenberg intentionally made these fraudulent misrepresentations for the specific purpose of encouraging and enticing JKV to enter into the Hospice Project contract with Triad and to issue joint payments for work performed on the project to Triad and Fortis.

Additionally, JKV alleged that Appellants entered into a civil conspiracy by which they would unlawfully benefit themselves at JKV's expense by absconding with the money JKV paid on the Hospice Project instead of paying the subcontractors. JKV sought damages in excess of $75,000 jointly and severally against all Appellants, an order disgorging Appellants from any monies paid by JKV, punitive damages, pre- and post-judgment interest, and costs and expenses.

A bench trial was held in March 2013. Before trial, the court struck Fortis's pleadings and found the company in default. Diaz, who was incarcerated for fraud, did not appear and was also found in default. Following the trial, the court entered judgment against Appellants on Count III and ordered them to pay JKV $124,299.23, plus $13,051.42 in pre-judgment interest. The court further ordered Appellants to pay punitive damages of $150,000, and it taxed court costs against Appellants.

6

Appellants filed a post-judgment motion to dismiss Count III or to vacate the judgment for lack of subject matter jurisdiction. In the motion, Appellants asserted that the bankruptcy court in Triad's bankruptcy proceeding had exclusive subject matter jurisdiction over the claim. The circuit court denied the motion. Appellants filed this appeal.

## STANDARD OF REVIEW

Our review of this court-tried case is governed by *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976). We will affirm the circuit court's judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Id.* When considering challenges based on the sufficiency of the evidence, we accept as true all evidence and inferences favorable to the judgment and disregard all contrary evidence and inferences. *Green Valley Seed, Inc. v. Plenge,* 72 S.W.3d 601, 603 (Mo. App. 2002). We defer to the circuit court's determination as to the credibility of witnesses and recognize that the court was free to believe or disbelieve all, part, or none of the testimony of any witness. *Arnold v. Minger*, 334 S.W.3d 650, 651 (Mo. App. 2011). We will reverse the circuit court's judgment on the basis that it is against the weight of the evidence only if we have "a firm belief that the judgment is wrong." *Pearson v. Koster*, 367 S.W.3d 36, 51 (Mo. banc 2012). We review issues of law *de novo*. *O'Riley v. U.S. Bank, N.A.*, 412 S.W.3d 400, 405 (Mo. App. 2013).

## ANALYSIS

7

*Subject Matter Jurisdiction*

In Point I, Appellants contend the circuit court erred in denying their motion to dismiss or to vacate the judgment on Count III for lack of subject matter jurisdiction. "Subject matter jurisdiction is the authority of a court to hear and decide a case." *State ex rel. Laughlin v. Bowersox*, 318 S.W.3d 695, 698 (Mo. banc 2010). Circuit courts in Missouri have subject matter jurisdiction over civil cases pursuant to article V, § 14 of the Missouri Constitution. *J.C.W. ex rel. Webb v. Wyciskalla*, 275 S.W.3d 249, 253 (Mo. banc 2009). However, "no state, including Missouri, can grant subject matter jurisdiction to its courts to hear matters that federal law places under the 'exclusive' jurisdiction of the federal courts." *Laughlin*, 318 S.W.3d at 698.

Appellants contend that this case involves a matter that is under the federal court's exclusive jurisdiction. They note that, under 28 U.S.C. § 1334(e)(1), the bankruptcy court has exclusive jurisdiction over the property of a bankruptcy estate. Relying primarily on *In re Bridge Information Systems, Inc.*, 325 B.R. 824 (Bankr. E.D. Mo. 2005), a case in which a bankruptcy court determined that a creditor's claim against the debtor's partners for fraudulent misrepresentation and civil conspiracy was property of the debtor's bankruptcy estate, Appellants argue that JKV's similar claim in Count III was property of Triad's bankruptcy estate and, therefore, subject only to the bankruptcy court's exclusive jurisdiction. We disagree.

Unlike in *Bridge*, the bankruptcy court in Triad's bankruptcy case never determined that JKV's claim against Appellants was the property of Triad's bankruptcy estate. Indeed, there is nothing in the record indicating that the bankruptcy trustee ever considered JKV's claim to be the property of Triad's estate or attempted to include the

8

claim in the estate. Triad's bankruptcy petition was pending at the same time as JKV's petition. According to JKV's brief on appeal, Triad's bankruptcy case was closed in August 2013, five months after trial and two months after the court entered its judgment in this case.

Essentially, Appellants are asking this court to find, in the first instance, that JKV's claim against Appellants was the property of Triad's bankruptcy estate. We have no authority to make such a finding. As Appellants noted in their motion to dismiss, the bankruptcy court "has exclusive jurisdiction *to decide whether certain property is property of the bankruptcy estate*." *In re True*, 285 B.R. 405, 412 (Bankr. W.D.Mo. 2002) (emphasis added). Because it is undisputed that the bankruptcy court did not exercise jurisdiction over JKV's claim, the circuit court properly exercised its jurisdiction. Point I is denied.

### *Fraudulent Misrepresentations*

In Point II, Appellants contend the evidence was insufficient to support the circuit court's finding that Triad's owners, T. Nadler, D. Nadler, and Rodenberg, made fraudulent misrepresentations to JKV. In its judgment, the court found that T. Nadler, D. Nadler, and Rodenberg knowingly made false and material representations in Triad's construction contract with JKV, its applications for payment, and the lien waivers with the intention that JKV rely on the representations and act on them by entering into the construction contract and by issuing payments.

Appellants argue that the misrepresentations were not made by T. Nadler, D. Nadler, and Rodenberg, but were instead made by Lloyd Black, an employee of non-party Triad, because he signed the documents containing the misrepresentations. They

9

assert that the individual owners of Triad cannot be held liable for Black's tortious conduct under a theory of *respondeat superior*, which "holds an employer liable for the torts committed by its employees while they are acting within the scope of employment." *Thornburg v. Fed. Express Corp.*, 62 S.W.3d 421, 429 (Mo. App. 2001). Appellants note that an employer cannot be held liable under the theory of *respondeat superior* when its employee is not held liable. *Id.* Because JKV did not assert a cause of action against Black, Appellants contend that T. Nadler, D. Nadler, and Rodenberg cannot be held liable for Black's fraudulent misrepresentations.

JKV does not seek to hold T. Nadler, D. Nadler, and Rodenberg liable for fraudulent misrepresentation under a theory of *respondeat superior*, however. JKV seeks to hold them liable for Triad's fraudulent misrepresentations under a theory of piercing Triad's corporate veil. "Where a corporation is used for an improper purpose and to perpetrate injustice by which it avoids its legal obligations, 'equity will step in, pierce the corporate veil and grant appropriate relief.'" *Irwin v. Bertelsmeyer*, 730 S.W.2d 302, 304 (Mo. App. 1987) (citation omitted). JKV was not asking the court to hold *Triad* liable for the wrongful acts of its employee Black -- a claim to which the theory of *respondeat superior* would have applied. Rather, JKV was asking the court to disregard Triad's corporate entity so that its *owners*, T. Nadler, D. Nadler, and Rodenberg, could be held individually liable for *the corporation's* fraudulent misrepresentations.

Courts will disregard the corporate entity and hold corporate owners liable for the corporation's wrongful acts if the following three elements are established:

> 1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in

10

respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and

2) Such control must have been used by the corporation to commit fraud *or* wrong, to perpetrate the violation of statutory or *other positive legal duty*, or dishonest and *unjust* act in contravention of plaintiff's legal rights; and

3) The control and breach of duty must proximately cause the injury or unjust loss complained of.

*66, Inc. v. Crestwood Commons Redevelopment Corp.*, 998 S.W.2d 32, 40 (Mo. banc 1999) (internal quotation marks and citation omitted).

Substantial evidence supported the circuit court's finding that JKV established these elements. Regarding the first element of control, T. Nadler, D. Nadler, and Rodenberg were clearly in control of Triad as they were its president and vice-presidents, respectively, and its only shareholders. Rodenberg testified that, together, he, T. Nadler, and D. Nadler controlled Triad's decisions and its finances.

On the second and third elements, the evidence showed that T. Nadler, D. Nadler, and Rodenberg used their control of Triad to perpetrate fraud against JKV, causing JKV injury. The essential elements of fraud are:

(1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent that it should be acted on by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of the falsity of the representation; (7) the hearer's reliance on the representation being true; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximately caused injury.

*Stander v. Szabados*, 407 S.W.3d 73, 81 (Mo. App. 2013). Triad represented that all work for which payment was requested would be free and clear of all liens, claims, or other encumbrances, that Triad would timely pay any subcontractors that performed

11

work on the Hospice Project, and that all work for which JKV had issued payment in response to an application for payment would be used to pay for the subcontracted work itemized in that application. Triad represented in its second payment application that the proceeds of the first payment application had been used to pay for the work therein represented. JKV's representative testified that these representations were material and that JKV would not have entered into the construction contract or issued payments without them. T. Nadler, D. Nadler, and Rodenberg agreed that these representations were material, that JKV had the right to rely on them, and that they intended for JKV to rely on them.

T. Nadler, D. Nadler, and Rodenberg also admitted that these representations were false, because they knew, particularly at the time the payment applications were submitted, that they had not paid, and would not be paying, any of the subcontractors on the Hospice Project with JKV's payments and that the property would, in fact, be subject to liens.[2] Triad's dire financial circumstances at the time the payment applications were submitted further supported the conclusion that T. Nadler, D. Nadler, and Rodenberg knowingly misrepresented that subcontractors had been, or would be, paid with payment application proceeds. In fact, T. Nadler, D. Nadler, and Rodenberg admitted that they made these representations in the second application for payment and in the lien waivers because they knew that JKV would not have made a second payment without these representations.[3] JKV was injured by these representations

_____

[2] The court noted in its judgment that, under Section 429.014, RSMo 2000, a contractor who fails or refuses to pay a subcontractor for services after the contractor has received payment from the property owner has committed lien fraud, regardless of whether the lien was perfected or filed.

[3] The knowingly false nature of the representations made at the time of Triad's payment applications is particularly critical to establishing fraud in this case and, thus, to piercing the corporate veil, and it serves

12

because it paid $124,299.23 to Triad and Fortis, none of which was used to pay the subcontractors. This caused JKV to have to negotiate directly with the subcontractors and spend an additional $70,373.78 to pay the subcontractors to keep liens from being filed against the Hospice Project property.

Evidence that T. Nadler, D. Nadler, and Rodenberg used their control of Triad to make fraudulent misrepresentations to JKV was sufficient to support the court's piercing the corporate veil to hold them individually responsible. Point II is denied.

*Damages*

In Point III, Appellants contend the court misapplied the law in determining the amount of damages. The court awarded JKV $124,299.23 in damages, which was the total amount that JKV paid to Triad and Fortis on the Hospice Project. Appellants assert the award resulted in a windfall to JKV. They argue that JKV will have paid only $70,373.78, the amount it paid directly to the subcontractors, for a project that was 100% completed and worth $134,112.10. Appellants contend the correct amount of damages is $60,560.91, which is the difference between the total amount that JKV paid, $194,673.01 ($124,299.23 to Triad + $70,373.78 to the subcontractors) and the total amount that JKV should have paid, $134,112.10, for the project.

Damages for fraud and deceit "are measured by the 'benefit of the bargain' rule." *Dierkes v. Blue Cross & Blue Shield*, 991 S.W.2d 662, 669 (Mo. banc 1999). The benefit of the bargain rule "allows a defrauded party to be awarded the difference between the actual value of the property and what its value would have been if it had been as represented." *Heberer v. Shell Oil Co.*, 744 S.W.2d 441, 443 (Mo. banc 1988).

---

to differentiate this case from a garden-variety breach of contract action involving the non-payment of subcontractors.

13

"In fraud cases where the benefit of the bargain rule is inadequate, other measures of damages may be used." *Dierkes*, 991 S.W.2d at 669. For example, "[t]he benefit of the bargain rule does not apply where the purchaser rescinds and returns the property received or where he received nothing of value." *Heberer*, 744 S.W.2d at 443. "In such case, he may properly recover the amount he paid with interest from the date of payment, plus incidental losses and expenses suffered as a result of the seller's misrepresentations." *Id*.

The "bargain" in this case included not only the completed project, but also Triad's unequivocal representations that, after it received payment from JKV, it would promptly pay any subcontractors that performed work on the Hospice Project; that JKV would not be responsible for payments to subcontractors; and that all work for which payment was requested would be free and clear of all liens, claims, or other encumbrances. The evidence showed that, instead of paying any of the subcontractors, T. Nadler, D. Nadler, and Rodenberg used JKV's payments to pay their own salaries, benefits, and expenses. The evidence further showed that T. Nadler's, D. Nadler's, and Rodenberg's failure to pay the subcontractors rendered the Hospice Project property subject to potential liens in the amount of $127,121.14.

Thus, while it is true that JKV received a finished Hospice Project constructed by Triad's subcontractors, the Hospice Project property was subject to potential liens from every one of those subcontractors. It was only after JKV negotiated directly with the subcontractors and paid them $70,373.78 that JKV was able to keep the subcontractors from filing liens on the property. Because T. Nadler, D. Nadler, and Rodenberg chose not to use JKV's payments to pay the subcontractors, thereby subjecting the property to

potential liens totaling $127,121.14, JKV essentially received nothing of value in return for the $124,299.23 it paid Triad and Fortis. Therefore, JKV was entitled to recover this amount as its damages. Point III is denied.

***Civil Conspiracy***

In Point IV, Appellants contend the circuit court's finding that a civil conspiracy existed between Appellants was not supported by substantial evidence and was against the weight of the evidence.[4] They argue that JKV failed to prove, by clear and convincing evidence as to each Appellant, the elements necessary to establish the existence of a civil conspiracy.[5]

"A 'civil conspiracy' is an agreement or understanding between persons to do an unlawful act, or to use unlawful means to do a lawful act." *Oak Bluff Partners, Inc. v. Meyer*, 3 S.W.3d 777, 780-81 (Mo. banc 1999). A civil conspiracy claim seeks "'to hold the conspirators jointly and severally liable for the underlying act.'" *W. Blue Print Co. v. Roberts*, 367 S.W.3d 7, 22 (Mo. banc 2012) (citation omitted). To establish a civil conspiracy, JKV had to show: "(1) two or more persons; (2) with an unlawful objective; (3) after a meeting of the minds; (4) committed at least one act in furtherance of the conspiracy; and (5) [JKV] was thereby damaged." *Id.* "Evidence of a civil conspiracy

---

[4] In both Point IV and Point V, Appellants assert a substantial-evidence challenge and an against-the-weight-of-the-evidence challenge. As the Supreme Court recently noted in *Ivie v. Smith*, No. SC 93872, 2014 WL 3107448, at *6, n.11 (Mo. banc July 8, 2014), "[t]hese are distinct claims" that "must appear in separate points relied on in the appellant's brief to be preserved for appellate review." Nevertheless, we will gratuitously address the merits of both claims.

[5] We review whether JKV presented clear and convincing evidence to support its claim of civil conspiracy under the *Murphy v. Carron* standard, because "[t]he same standard of review applies in all types of court-tried cases regardless of the burden of proof at trial." *Ivie*, 2014 WL 3107448, at *6 (footnotes omitted). Thus, we will affirm the circuit court's judgment if it was supported by substantial evidence and was not against the weight of the evidence. *In re J.A.R.*, 426 S.W.3d 624, 626 (Mo. banc 2014).

may be circumstantial." *Kansas City Downtown Minority Dev. Corp. v. Corrigan Assocs. Ltd. P'ship*, 868 S.W.2d 210, 222 (Mo. App. 1994).

In its judgment, the court found that Appellants "knowingly developed and entered into a civil conspiracy wherein they would unlawfully benefit themselves at the expense of [JKV] by absconding with monies paid by [JKV] on the Hospice project which were supposed to be used for paying subcontractors." The evidence supporting this finding as to T. Nadler, D. Nadler, and Rodenberg showed that they, "as a group," controlled Triad's finances. Triad had a negative balance in its checking account until receiving the first payment from JKV in January 2011. In fact, the previous eight checks written on this account had bounced for insufficient funds before the deposit of JKV's first check for $68,787.90.

After depositing JKV's payments into Triad's checking account, T. Nadler, D. Nadler, and Rodenberg used those funds to pay bi-weekly salaries to themselves, to reimburse themselves for undocumented expenses, and to pay for health insurance premiums, automobile payments, and cell phone bills. T. Nadler, D. Nadler, and Rodenberg also used the payments from JKV to write unexplained checks directly to Triad and to pay Fortis for work on other projects.

Triad's accountant testified that she spoke with T. Nadler, D. Nadler, and Rodenberg on "many" occasions about paying the subcontractors on the Hospice Project for their work. All three of Triad's owners were authorized to write checks on Triad's account. Despite knowing that the subcontractors had not been paid and having the ability to cut checks to the subcontractors, none of Triad's owners paid the

16

subcontractors on the Hospice Project.  Instead, they liquidated Triad's bank account down to approximately $500 before filing for bankruptcy in April 2011.

Appellants contend that the joint check agreements between Triad and Fortis indicated a lack of a meeting of the minds to defraud JKV.  Specifically, they argue that the purpose of the joint check agreements was to ensure that Triad paid Fortis for its work on the Project as one of Triad's subcontractors.  Contrary to Appellants' contention, however, evidence concerning the joint check agreements supported the court's finding that a civil conspiracy existed, because the record showed that Appellants did not follow the terms of the joint check agreements.  Although the agreements provided that all monies were to be deposited into Fortis's bank account, JKV's first two checks, which totaled $123,830.15, were deposited into Triad's bank account.  Because T. Nadler, D. Nadler, and Rodenberg were also three of the four owners of Fortis, the court could reasonably infer that the reason the checks were deposited into Triad's bank account instead of Fortis's was because T. Nadler, D. Nadler, and Rodenberg planned to liquidate Triad's account and file bankruptcy on behalf of Triad, in an attempt to shield themselves from liability.

Moreover, the record refuted Appellants' assertion that the purpose of the agreements was to ensure that Triad would pay Fortis for its work on the Project. Triad's records showed that, on February 15, 2011, Triad wrote a check to Fortis for $40,600 for three invoices that were purportedly for Fortis's work on the Hospice Project.  While Fortis's billing history for the Hospice Project indicated that Fortis received the $40,600 payment on February 16, 2011, the record showed that Fortis backed out over $35,000 of that payment on June 3, 2011, two months after Triad filed

17

bankruptcy. The billing history then indicated that, as of June 3, 2011, Fortis was owed $36,456.92 for its work on the Hospice Project. Fortis subsequently filed a lien against the Hospice Project property for that amount. From this evidence, the court could reasonably infer that Fortis and Diaz, who was Fortis's majority owner and president, were part of the civil conspiracy to defraud JKV.

Clear and convincing circumstantial evidence established that each of the Appellants acted with a "unity of purpose," a "common design and understanding," or "a meeting of the minds" to unlawfully benefit themselves at JKV's expense by conveying JKV's payments on the Hospice Project to themselves, either directly or indirectly, instead of to the subcontractors. *Oak Bluff*, 3 S.W.2d at 781 (internal quotation marks and citation omitted). The circuit court's finding that a civil conspiracy existed was supported by substantial evidence.

Appellants argue that there was contrary evidence indicating the lack of a conspiracy, including that they used JKV's money not to benefit themselves, but to pay Triad's employees and "necessary business expenses"; that neither Rodenberg nor Fortis paid themselves back in full for the money that Triad owed them before Triad filed bankruptcy; and that JKV was not Triad's sole or largest source of revenue. "When the evidence poses two reasonable but different conclusions, appellate courts must defer to the circuit court's assessment of that evidence." *Ivie v. Smith,* No. SC 93872, 2014 WL 3107448, at *12 (Mo. banc July 8, 2014). Based upon the findings and conclusions in the judgment, it is clear that the court put "little or no stock" in this evidence from Appellants. See *In re J.A.R.*, 426 S.W.3d 624, 632 n.14 (Mo. banc 2014). Deferring to

18

the circuit court's assessment of the evidence, we do not firmly believe that the court's finding that a civil conspiracy existed is wrong.    Point IV is denied.

**Punitive Damages**

In Point V, Appellants contend the circuit court's determination that punitive damages were warranted was not supported by substantial evidence and was against the weight of the evidence.

Punitive damages require clear and convincing proof of a culpable mental state, either from a wanton, willful, or outrageous act, or from reckless disregard for an act's consequences such that an evil motive may be inferred." *Drury v. Mo. Youth Soccer Ass'n, Inc.*, 259 S.W.3d 558, 573 (Mo. App. 2008).  "The necessary mental state is found when a person intentionally does a wrongful act without just cause or excuse." *Id*. "When someone intentionally commits a wrong and knew that it was wrong at the time, an evil motive and wanton behavior is exhibited." *Id*.  Additionally, "[a]n evil intent may also be inferred where a person recklessly disregards the rights and interests of another person." *Id*.

In this case, the evidence showed that T. Nadler, D. Nadler, and Rodenberg knew JKV was relying on their representations that the subcontractors would be paid and that the work performed on the Hospice Project would be free of liens.  Indeed, T. Nadler testified at trial that, when he sent the second application for payment and the final waiver of lien to JKV, he did not warn JKV that the subcontractors could, in fact, file liens against the property because he knew that JKV would not have made the second payment to them and JKV's money was "vital to our operation."[6]  The evidence further showed that T. Nadler, D. Nadler, and Rodenberg knowingly used JKV's payments not

---

[6] D. Nadler and Rodenberg testified that they heard and agreed with all of T. Nadler's testimony.

19

to pay the subcontractors, but to pay bi-weekly salaries to themselves, to reimburse themselves for undocumented expenses, and to pay health insurance premiums, automobile payments, and cell phone bills.

As to Diaz and Fortis, the evidence established that Fortis was paid $40,600 from JKV's payments, and Fortis initially indicated on its accounting records that this amount was for its work on the Hospice Project. After Triad filed bankruptcy, however, Fortis removed over $35,000 of that payment from the accounting ledger to make it appear as if it had not been paid. Diaz, on behalf of Fortis, then filed a lien against the Hospice Project property for $36,456.92 in an attempt to recollect the amount that had already been paid to Fortis and removed from its books.

All of this evidence was sufficient to support the circuit court's determination that Appellants' conduct was malicious and premised upon an evil motive that was intentional, willful, reckless, and indifferent to JKV's rights. Appellants note that they offered good character evidence, evidence that they had made personal loans to Triad and taken pay cuts, and evidence that they acted only negligently and not intentionally in falsely certifying on the second payment application that the subcontractors had been paid. They argue that this evidence negated any finding that they acted with evil motive or reckless indifference. While we consider contrary evidence in our review, "we still defer to the [circuit] court's credibility decisions and will find a judgment to be against the weight of the evidence only when we firmly believe the judgment is wrong." *Ries v. Shoemake*, 359 S.W.3d 137, 146 n.1 (Mo. App. 2012). Deferring to the circuit court's credibility decisions in this case, we do not firmly believe that its judgment awarding punitive damages is wrong. Point V is denied.

## CONCLUSION

We affirm the circuit court's judgment.

_____
LISA WHITE HARDWICK, JUDGE


ALL CONCUR.

21